UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| IN RE: DEPUY ORTHOPAEDICS, INC. PINNACLE HIP IMPLANT PRODUCT LIABILITY LITIGATION | MDL No. 2244 |
| This Document Relates To: | Honorable Ed Kinkeade |
| *Aoki v. DePuy Orthopaedics, Inc., et al.* No. 3:13-cv-01071-K | |
| *Christopher v. DePuy Orthopaedics, Inc., et al.* No. 3:14-cv-01994-K | |
| *Greer v. DePuy Orthopaedics, Inc., et al.* No. 3:12-cv-01672-K | |
| *Klusmann v. DePuy Orthopaedics, Inc., et al.* No. 3:11-cv-02800-K | |
| *Peterson v. DePuy Orthopaedics, Inc., et al.* No. 3:11-cv-01941-K | |
| *Thibodeau v. DePuy Orthopaedics, Inc., et al.* No. 3:13-cv-01027-K | |

## DEFENDANTS' MOTION TO AMEND SECOND AMENDED ORDER ON BELLWETHER TRIALS

Bellwether trials are supposed to be representative cases, tried with an eye toward providing the Court and the parties with guidance regarding the broader claims pool. Recent developments have revealed that three bellwether candidates – the *Peterson*, *Klusmann* and *Aoki* cases – are not representative of the claims pool because the plaintiffs in these cases were treated by Dr. Eric Matthew Heinrich, one of only two orthopedic surgeons specializing in hip surgery that were retained by DePuy to provide expert testimony in this litigation.

Plaintiffs' evident purpose in nominating these three cases as bellwether candidates has been revealed by their amended complaints, which add claims challenging DePuy's retention of Dr. Heinrich as an expert and/or consultant, including claims for tortious interference and

vicarious breach of fiduciary duty.  Although these claims lack merit for the reasons set forth in defendants' pending motion to dismiss (*see* Mem. In Supp. Of Partial Mot. To Dismiss The Compl., *Aoki* ECF No. 20; *Klusmann* ECF No. 29; *Peterson* ECF No. 31), they would inevitably result in a sideshow at trial unless they are dismissed by the Court.  Indeed, given plaintiffs' new focus, any trial of these cases would inevitably turn into a trial about DePuy's expert, not a trial about the hip implant.  As a result, the three cases are now extreme "outliers" – precisely what the Court sought to avoid when it rejected the remaining cases in the first bellwether pool and directed the parties to propose a new set of cases that would help the parties and the Court determine the nature, strength and value of the claims in the pool generally.

For these reasons, discussed further below, defendants DePuy Orthopaedics, Inc., DePuy Products, Inc., Johnson & Johnson, Johnson & Johnson Services, Inc., and DePuy International, Ltd. respectfully move the Court to revise the second amended order on bellwether trials entered August 26, 2015 (ECF No. 551) by removing the *Aoki*, *Klusmann*, and *Peterson* cases from the list of cases to be prepared for trial.

## **BACKGROUND**

Dr. Heinrich is a respected orthopedic surgeon who practices in Austin, Texas.  Beginning in 2005, well before the Pinnacle MDL proceeding was established, DePuy contracted with Dr. Heinrich to provide various services, such as training and educational programs, related to numerous DePuy hip and knee products.  Separately, DePuy retained Dr. Heinrich in August 2013 as an expert witness in the Pinnacle litigation, long before the present slate of bellwether candidates was selected.  Dr. Heinrich testified as an expert in the *Paoli* trial and was not a treating surgeon in that case; nor did he ever treat any of the other plaintiffs in the first group of bellwethers.

After the *Paoli* trial, the Court decided to discard the remaining set of original bellwether selections and chose a fresh set of cases. Three of the plaintiffs proposed by plaintiffs' counsel for the new slate of bellwether candidates, Mr. Peterson, Mr. Klusmann and Ms. Aoki, were patients of Dr. Heinrich. Dr. Heinrich was the implanting and revising surgeon for Mr. Klusmann; the implanting surgeon for Ms. Aoki; and the revising surgeon for Mr. Peterson. In their amended complaints filed on August 21, 2015, Mr. Peterson and Mr. Klusmann have added two new causes of action challenging DePuy's retention of Dr. Heinrich as a consulting expert in this litigation. Specifically, Mr. Peterson and Mr. Klusmann claim that by employing Dr. Heinrich as a testifying expert in the first round of bellwether cases, defendants tortiously interfered with their physician-patient relationship with Dr. Heinrich and also that defendants are vicariously liable for Dr. Heinrich's alleged breach of fiduciary duty. (*See, e.g.*, Peterson Am. Compl. ¶¶ 130-45; Klusmann Am. Compl. ¶¶ 132-47.)[1]

In addition, Mr. Klusmann and Ms. Aoki now allege that DePuy's payments to Dr. Heinrich as a consulting surgeon vitiate the doctor's status as a "learned intermediary," precluding DePuy from invoking the "learned intermediary" doctrine. (Klusmann Am. Compl. ¶ 68; Aoki Am. Compl. ¶ 67.) And all three of these plaintiffs allege that the payments made to Dr. Heinrich constitute bribery under Texas law such that the statutory cap on punitive damages should not apply in their cases. (Aoki Am. Compl. ¶¶ 137-41; Klusmann Am. Compl. ¶¶ 156-60; Peterson Am. Compl. ¶¶ 154-58.) These allegations are frivolous and have no support in Texas law, but even if they are dismissed pursuant to defendants' pending motion, they still highlight the issues that Dr. Heinrich's role as a treating surgeon would inject into any trial of

---

[1]  Defendants initially raised this issue in correspondence dated September 11, 2015. (*See* Letter to Special Master, dated September 11, 2015 (attached as Ex. 1) (Appendix pp. 1-4), and related emails from plaintiffs' counsel and defense counsel, dated September 14, 2015 and September 21, 2015 (attached as Ex. 2) (Appendix pp. 5-8).)

3

these cases – issues that have absolutely no bearing on the vast majority of cases pending in this MDL proceeding.

Notably, despite the Court's instruction that the parties try to select cases that will not be "outliers," plaintiffs did not inform defendants or the Court about their new claims based on Dr. Heinrich's work for DePuy until after these cases had been selected by the Court and the Court had already eliminated three of the original nine bellwether candidates in the Second Amended Order on Bellwether Trials, dated August 26, 2015. This is so even though defendants began expressing concerns about the representativeness of these cases several weeks earlier. (*See* email from S. Harburg to Special Master Stanton, Aug. 5, 2015 (attached as Ex. 3) (Appendix p. 9) ("a case where Dr. Heinrich is the treating surgeon would not be at all representative of the other cases in the MDL proceeding that could be tried").)

## ARGUMENT

The purpose of bellwether trials is to "produce a sufficient number of ***representative*** verdicts" to "enable the parties and the court to determine the nature and strength of the claims, [and] whether they can be fairly developed and litigated on a group basis." *Manual For Complex Litigation* § 22.315 (4th ed. 2004) (emphasis added). "The more representative the [bellwether cases], the more reliable the information about similar cases will be." *Id.*; *see also In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 628 F.3d 157, 161 (5th Cir. 2010) (the "focus [must be] placed on an attempt to find representative plaintiffs' claims"); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, No. 3:09-md-02100-DRH-PMF, MDL No. 2100, 2010 U.S. Dist. LEXIS 108107, at *4 (S.D. Ill. Oct. 8, 2010) ("It is critical to a successful bellwether plan that an honest representative sampling of cases be achieved."). Accordingly, it is critical that bellwether trial plaintiffs be as representative as

possible of the entire claimant pool.  *See In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09md2087 BTM(KSC), 2012 U.S. Dist. LEXIS 118980, at *56-57 (S.D. Cal. Aug. 21, 2012) (where "the 'representativeness' of the case is questionable . . . its value as a bellwether case is diminished"); *Morgan v. Ford Motor Co.*, No. 06-1080 (JAP), 2007 U.S. Dist. LEXIS 36515, at *34 (D.N.J. May 17, 2007) ("[T]o ensure the usefulness of bellwether plaintiffs to the process and the parties' due process rights, representative plaintiffs must be chosen.").  Correspondingly, MDL courts should not "permit[] unrepresentative cases to serve as bellwether trials."  Hon. Eldon E. Fallon et al., *The Problem of Multidistrict Litigation: Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2348 (2008) ("Because the primary goal in filling the trial-selection pool is to narrow the field of potential bellwether cases to those that are representative, a selection method that may potentially frustrate this purpose by permitting unrepresentative cases to serve as bellwether trials should be rejected."); *see also In re Chevron U.S.A.*, 109 F.3d 1016, 1020 (5th Cir. 1997) ("[T]he results that would be obtained from a trial of these thirty (30) cases lack the requisite level of representativeness so that the results could permit a court to draw sufficiently reliable inferences about the whole that could, in turn, form the basis for a judgment affecting cases other than the selected thirty.").

     The new allegations and accusations set forth by Mr. Peterson, Mr. Klusmann and Ms. Aoki, which do not appear in the amended complaints for the other three bellwether plaintiffs, demonstrate that these individuals' cases would not be representative of the overall claimant pool.  As explained above, these new allegations and claims center solely on the fact that Dr. Heinrich treated these plaintiffs and that DePuy retained Dr. Heinrich both as an expert in the broader litigation and prior to that as a consultant in connection with non-litigation-related services, such as training and educational programs he presented.  Because this fact pattern will

recur in only a tiny fraction of the thousands of pending cases (i.e., those in which one of DePuy's orthopaedic litigation experts is also the treating surgeon), preparing these cases for a bellwether trial will waste the resources of the parties and the Court.  At a minimum, the parties would need to litigate the viability of these unique claims as a matter of Texas law, requiring substantial motion practice that will produce zero benefit to the mass of pending cases.  And if plaintiffs somehow succeed in bringing any of these groundless claims to trial, the jury would inevitably be confused and could well decide the case on some issue ***other than*** the core allegations of design defect and failure to warn.

In addition, any trial of the new claims would likely introduce issues and dynamics that would never be present in the vast majority of cases where the treating surgeon was not a testifying expert for DePuy, negating any guidance that a verdict could provide to the Court or the parties about how other Pinnacle cases are likely to play out at trial.  To take just one example, the treating doctor is often a critical witness in a case, but in these cases, the examination of Dr. Heinrich would be profoundly different from that of an ordinary treating surgeon because of his status as a testifying expert for DePuy in other cases.  Given Dr. Heinrich's role, defendants expect plaintiffs would cross-examine him at length on matters such as the amounts he has been paid as an expert and their unwarranted claims that his treatment of the plaintiffs was unethical in light of his role as a testifying expert in other cases.  This attack on the treating surgeon would not exist in virtually any of the other cases in the MDL proceeding.

In short, trying any of these cases as a bellwether trial would result in precisely the situation the Court was concerned about during *Paoli* and told the parties it wanted to avoid going forward:  cases that are extreme outliers from the rest of the pool because they focus on extraneous issue regarding the treating surgeon, unrelated to whether the Pinnacle Ultamet

6

implant was defective, and whether the alleged defect caused the plaintiff's injury. If any of these cases is tried as a bellwether, the Court and the parties will likely have wasted a year's worth of preparation for a trial that produces nothing of value in terms of resolving the mass of pending cases. For these reasons, litigating plaintiffs' novel causes of action and Dr. Heinrich's atypical role as a treater and testifying expert would waste, not "conserve[]," precious resources – undermining one of the core purposes of the Pinnacle MDL proceeding. *In re Yasmin & Yaz*, 2010 U.S. Dist. LEXIS 108107, at *6-7 ("[l]ittle credibility will be attached to this [bellwether selection] process, and it will be a waste of everyone's time and resources, if cases are selected which do not accurately reflect the run-of-the-mill case").[2]

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court remove Mr. Peterson, Mr. Klusmann and Ms. Aoki from the pool of bellwether plaintiffs for the upcoming trial.

Dated: October 15, 2015

Respectfully submitted,

s/ Michael V. Powell
Michael V. Powell
Seth M. Roberts
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
(214) 740-8453

s/ Stephen J. Harburg
John H. Beisner
Stephen J. Harburg
Jessica Davidson Miller
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

---

[2] The Heinrich patients' claims are atypical for additional reasons as well. Mr. Klusmann's clinical history is atypical because he had bilateral implants and revisions, including multiple revisions on one side. Additionally, his case is unusual because of his mental health issues. (*Klusmann* ECF Nos. 15, 30; MDL ECF No. 549.) Mr. Klusmann claims damages for alleged emotional harms resulting from his hip replacement surgery, but the parties dispute whether those harms have preexisting causes, raising issues unlikely to be present in most cases, including discovery issues that are the subject of a pending motion. Similarly, Ms. Aoki is also an inappropriate candidate for a bellwether trial because her metal-on-metal Pinnacle hip implant was implanted *after* the recall of DePuy's ASR hip implant, which means that her case would be subject to different evidence from the others. Notably, of the approximately 180,000 Pinnacle Ultamet hip implants sold/implanted between 2001 and the product's withdrawal from the market in 2014, less than 5 percent were sold/implanted after the recall of the ASR implant in 2010.

COUNSEL FOR DEFENDANTS DEPUY ORTHOPAEDICS, INC., DEPUY PRODUCTS, INC., DEPUY INTERNATIONAL, LTD., JOHNSON & JOHNSON and JOHNSON & JOHNSON SERVICES, INC.