UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| IN RE: DEPUY ORTHOPAEDICS, INC. PINNACLE HIP IMPLANT PRODUCTS LIABILITY LITIGATION | MDL No. 2244<br><br>Honorable Ed Kinkeade |
| *This Document Relates To:*<br><br>*Aoki* – 3:13-cv-01071-K<br>*Christopher* – 3:14-cv-01994-K<br>*Greer* – 3:12-cv-01672-K<br>*Klusmann* – 3:11-cv-02800-K<br>*Peterson* – 3:11-cv-01941-K<br>*Thibodeau* – 3:13-cv-01027-K | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO
AMEND SECOND AMENDED ORDER ON BELLWETHER TRIALS**

**I. Introduction & Background**

After the first bellwether trial of this multi-district litigation ("MDL"), the Court ordered that new bellwether candidates be selected. From that selection process came the current six bellwether candidates, three of which had Dr. Matthew Heinrich as the implanting or revising surgeon (or both) – Margaret Aoki, Richard Klusmann and Robert Peterson. Defendants now seek to have these three bellwether candidates removed from the pool. After presenting Dr. Heinrich as an expert orthopaedic surgeon in the *Paoli* trial, the Defendants now seek to avoid trying these three cases simply because these plaintiffs were Dr. Heinrich's patients. Because these three cases are, in fact, representative of the

several thousand cases pending in this MDL, Defendants' request should be denied.

## II. Argument & Authorities

28 U.S.C. § 1407 authorizes consolidation of "civil actions involving one or more common questions of fact…," a relatively low standard. Cases selected for trial as "bellwethers" in an MDL should be *representative* of the other pending cases, but they need not be identical.[1]

> If individual trials, sometimes referred to as bellwether trials or test cases, are to produce reliable information about other mass tort cases, the specific plaintiffs and their claims should be <u>representative of the *range* of cases</u>. … Test cases should produce a <u>sufficient number of representative verdicts</u> and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis, and <u>what *range* of values the cases may have</u> if resolution is attempted on a group basis. The more representative the test cases, the more reliable the information about similar cases will be.

MANUAL FOR COMPLEX LITIGATION § 22.315 (4th ed. 2004) (emphasis added). Thus, as the Manual notes, some inherent variation in the nature of bellwether cases is to be expected, as that variation is reflective of the totality of cases in an MDL.

Importantly, Defendants' motion does not challenge the representative character of the Aoki, Klusmann and Peterson cases on the most salient facts –

---

[1] In fact, some variation is inherent with an MDL, because if the consolidated cases were *identical*, you would in effect have the perfect class action.

2

the course of their medical treatment with the Defendants' product or the injuries they sustained.  They are not alleged to be "outliers" on those grounds, and such an allegation would be unfounded because, as discovery has shown, the facts of the Aoki, Klusmann and Peterson cases are indeed representative of a typical Pinnacle metal-on-metal hip implant recipient who had to undergo an early revision surgery as a result of the defective condition of the Defendants' product.

Instead, Defendants object to the inclusion of Aoki, Klusmann and Peterson because they were treated by a surgeon whom Defendants paid handsomely and with whom Defendants have had a long-standing "consulting" relationship.  This is hardly a unique situation.  In fact, the practice of Defendants paying surgeons to promote their products is systemic and widespread throughout the orthopaedic surgeon community. During the *Paoli* trial, Plaintiffs offered a 786 page spreadsheet listing payments by Defendants to hundreds of orthopaedic surgeons all over the country.[2] Furthermore, as the Court is aware, Defendants' practice of paying surgeons to promote and use their products was so extensive and widespread that the United States Department of Justice launched a criminal investigation into the practice, and Defendants paid a significant civil penalty and entered into a deferred prosecution agreement to avoid criminal prosecution.  The conduct under investigation occurred prior to 2007, when the Defendants were aggressively promoting their newly developed

---

[2] Plaintiffs' Exhibit P-09910 (*Paoli* trial).

3

Pinnacle metal-on-metal hip implant system to orthopaedic surgeons throughout the United States. There can be no doubt that physicians paid by the Defendants treated many of the plaintiffs with claims pending in this MDL.

It is also not unusual that one of Defendants' paid surgeons has patients who have filed lawsuits in this MDL. Defendants maintain an internal database of surgical procedures known as "DOTS" – the DePuy Outcomes Tracking System – and the participating surgeons are compensated by Defendants. There are at least 264 plaintiffs with cases pending in this MDL who were treated by a DOTS surgeon. This number is particularly significant considering the relatively small number of DOTS sites (only 20 in the U.S.)[3] and the difficulty in accessing the information necessary to determine all the relevant connections. For all of these reasons, the cases of Aoki, Klusmann and Peterson are representative of a wide range of claims pending in this MDL and were correctly selected as bellwether candidates.[4]

The current pool of six bellwether cases will allow the jury to decide claims involving a treating doctor who had a close relationship with and was paid by

---

[3] At least three DOTS surgeons were also so-called Pinnacle "design surgeons" who received royalty payments from Defendants related to the Pinnacle hip implant system.

[4] Defendants are incorrect in their argument that any examination of Dr. Heinrich in the upcoming trial would involve cross-examination topics that would not exist in virtually any of the other cases pending in the MDL proceeding. Considering the large number of paid surgeons, many of the topics discussed with Dr. Heinrich would be germane to other cases. Likewise, Heinrich's status as a so-called "learned intermediary" will be similar to other cases where the plaintiff's treating surgeon was a paid consultant rather than a true, independent intermediary.

Defendants, as well as claims involving independent treating surgeons. Many of the cases in this MDL involve plaintiffs treated by paid doctors, and many do not. Allowing the jury in the upcoming bellwether trial to evaluate both types of cases will provide insight into the future course of this litigation, because the current bellwether pool is reflective of the several thousand cases currently pending in this MDL – consistent with the Manual for Complex Litigation's guidance.[5]

Defendants' motion focuses on the claims asserted in the amended complaints filed by Aoki, Klusmann and Peterson regarding the Defendants' interaction with Dr. Heinrich. However, the Defendants sought removal of Aoki, Klusmann and Peterson from the bellwether pool before they amended their complaints to assert the new allegations. By email dated August 5, 2015, Defendants argued that the designation of Aoki, Klusmann and Peterson as bellwether candidates impaired their ability to use Dr. Heinrich as an expert, and also contended that the facts involved in Aoki's, Klusmann's and Peterson's cases rendered them poor bellwether selections. (Civ. Act. No. 3:11-md-2244-K, Doc. 569-1, at Appendix 9).[6] Despite their long-standing relationship with

---

[5] "Test cases should produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis, and what range of values the cases may have if resolution is attempted on a group basis." MANUAL FOR COMPLEX LITIGATION § 22.315 (4th ed. 2004).

[6] Aoki, Klusmann and Peterson filed their amended complaints on August 21, 2015.

5

Dr. Heinrich and their willingness to offer him as an expert in this MDL, Defendants now want to avoid trying cases that involve him as a treating physician. Defendants injected Dr. Heinrich into this MDL, and they should not be permitted to eliminate bellwether candidates simply because Dr. Heinrich treated them.

Defendants further argue that the PEC's purpose in designating Aoki, Klusmann and Peterson as bellwether candidates was to turn the upcoming bellwether trial into a "sideshow." Although Aoki, Klusmann and Peterson have asserted additional allegations due to the relationship between Defendants and Dr. Heinrich, the PEC has no doubt that those issues can be adequately managed by the Court. Defendants underestimate the intelligence of jury members (and, by implication, the efficacy of our judicial process) if they believe that "the jury would inevitably be confused and could well decide the case on some issue other than the core allegations of design defect and failure to warn." This Court routinely presides over complex claims, often with overlapping and intertwined facts, and is certainly capable of addressing any potential for jury confusion.

In addition, the parties have spent a tremendous amount of time and resources preparing this pool of bellwether cases for trial. Defendants were able to determine that Dr. Heinrich was a treating surgeon for Aoki, Klusmann and Peterson as soon as those cases were identified as potential bellwethers. It would

be impossible to replace them in time for the upcoming bellwether trial. For this reason, too, Defendants' motion should be denied.

Finally, as the Court well knows, it has broad discretion in managing its docket and the cases over which it presides. This discretion is expanded in the management of an MDL given the unpredictable contours of complex litigation. As the Manual for Complex Litigation (4th ed. 2004) notes:

> Complex litigation should not be viewed as monolithic…. In [areas of law] such as … mass tort litigation, rules are still emerging or undergoing change.
>
> . . .
>
> Much complex litigation, therefore, will take the judge and counsel into sparsely charted terrain with little guidance on how to respond to pressing needs for effective management. Practices and principles that served in the past may not be adequate, their adaptation may be difficult and controversial, and novel and innovative ways may have to be found.
>
> While this Manual for Complex Litigation, Fourth should be helpful within the limits of its mission, it should be viewed as open-minded, and judges are encouraged to be innovative and creative to meet the needs of their cases while remaining mindful of the bounds of existing law and any variations within their own circuits.

The current pool of bellwether plaintiffs is, contrary to Defendants' objections, representative of the range of cases pending in this MDL. The trial of these cases will be instructive to the Court and the parties. Plaintiffs respectfully request that the Court exercise its inherent authority to effectively manage this MDL and deny Defendants' request.

### III.  Conclusion & Prayer

For the reasons stated, Plaintiffs pray that this Court deny Defendants' motion and retain Peterson, Klusmann, and Aoki as bellwether plaintiffs for the upcoming trial.

Dated:   November 5, 2015					Respectfully submitted,

*Plaintiffs' Co-Lead Counsel:*

By: /s/ W. Mark Lanier
W. Mark Lanier
THE LANIER LAW FIRM
6810 FM 1960 Rd W
Houston, TX 77069-3804
Telephone: (713) 659-5200
Fax: (713) 659-2204
E-mail: wml@lanierlawfirm.com

Larry P. Boyd
Wayne Fisher
Justin Presnal
FISHER, BOYD, JOHNSON
& HUGUENARD, LLP
2777 Allen Parkway, Suite 1400
Houston, Texas 77019
Telephone: (713) 400-4000
Fax: (713) 400-4050
E-mail: lboyd@fisherboyd.com
E-mail: wfisher@fisherboyd.com
E-mail: justinp@fisherboyd.com

*Plaintiffs' Executive Committee on behalf of the Plaintiffs' Steering Committee:*

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71301
Telephone: (800) 256-1050
Fax: (318) 561-2591
E-mail: rarsenault@nbalawfirm.com

Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue
New York, NY 10016
Telephone: (212) 784-6402
Fax: (212) 213-5949
E-mail: jconroy@simmonsfirm.com

## CERTIFICATE OF SERVICE

I certify that the foregoing instrument was served on all counsel of record by the Court's CM/ECF system, and was also forwarded to counsel for the Defendants by electronic mail on November 5, 2015.

    /s/ Justin Presnal